## MID–CONTINENT INV. CO. et al. v. MERCOID CORPORATION (two cases).

### Nos. 8008, 8009.

Circuit Court of Appeals, Seventh Circuit.
Dec. 23, 1942.

Rehearing Denied March 27, 1943.

804

Richard Spencer, Richard L. Johnston, Wm. P. Bair, Will Freeman, Lloyd C. Root, and Spencer, Marzael, Johnston & Cook, all of Chicago, Ill., for appellants.

Langdon Moore, of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

The original plaintiff, Mid-Continent Investment Company (hereafter referred to as Mid-Continent) charged the Mercoid Corporation (hereafter referred to as Mercoid), with contributory infringement of United States Combination Patent No. 1,-758,146 to Cross. The patent was issued May 13, 1930, on an application filed November 11, 1926. On June 2, 1932, it was assigned to Mid-Continent, subject, how-

ever, to an exclusive license, dated December 23, 1931, to Minneapolis-Honeywell Regulator Company (hereafter referred to as Honeywell).

The invention relates to improvements in domestic heating systems, and refers more particularly to a hot air system of heating in which the combustion gases passing to the flue are reduced in temperature in their passage through a heat exchanging device below the kindling temperature of wood. Among the particular objects of the invention are to provide a system having a furnace into which is mechanically and automatically fed a comminuted coal, such as disintegrated coal; also a system which is automatically controlled by a dual system of control, one phase of which operates the fuel feed and a force draft mechanism by variations in the room temperature, and the other operates the fuel feed and force draft by predetermined minimum temperatures in the furnace or combustion pot.

There are five claims and Claim 1 is typical: "A heating system comprising a combustion pot, means for feeding fuel thereto, a combustion space above the combustion pot, means controlled by the temperature of the rooms to be heated for automatically regulating the fuel feeding means, and a separate thermostatic control actuated by predetermined minimum temperatures in said combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions."

The accused controls are referred to by the parties as Mercoid's M-61; TJV and M-11; and JMV.

The complaint alleges that the issues of validity, and infringement by heating systems employing Mercoid's equipment, are res adjudicata in this suit by reason of their having been adjudicated in a proceeding in a District Court of Missouri, wherein the defense was conducted by the attorney for and at the expense of Mercoid. That court found, concluded, and decreed that this patent was valid and infringed by heating systems employing equipment made by Mercoid, and that decree was affirmed by the Eighth Circuit in Smith v. Mid-Continent Inv. Co., 106 F.2d 622.

Mercoid in its answer herein denied infringement or that the patent was duly and legally issued to Cross, or that its validity was res adjudicata. It also counterclaimed upon the allegations of the answer that none of the elements of the combination were the invention of Cross, but all had been sold by Mercoid and its predecessor since the latter part of November, 1925; that the effect of the Honeywell license to make, use and sell the old elements of the patent was to create a monopoly beyond the boundaries of the patent, which disclosed a lack of good faith and unfair competition and which had resulted in irreparable damage to Mercoid. It asked for a declaratory decree defining the parties' rights under the premises recited, for triple damages, and for injunctive relief both preliminary and permanent. Thereupon the court, upon Mercoid's motion, made Honeywell an additional party plaintiff. Thereafter Honeywell involuntarily appeared specially and replied to Mercoid's counterclaim, admitting its license, setting it forth as an exhibit, but denied all allegations as to a monopoly, conspiracy, bad faith, intimidation, misuse, coercion or improper threats. It alleged full and faithful performance of the license on its part and averred its willingness to release its exclusive license in order to permit Mid-Continent to license Mercoid if the latter so desired. This pleading avoided a response to all paragraphs of the counterclaim directed solely to allegations relating to Mid-Continent.

Mid-Continent replied to Mercoid's counterclaim, and besides denying its actionable allegations, averred that those sections purporting to seek relief under the Declaratory Judgment Act, 28 U.S.C.A. § 400, should be dismissed because they set up alleged causes of action that had previously been placed in issue by the complaint and Mercoid's answer. Furthermore, the reply urged that the entire counterclaim should be dismissed because all issues raised therein were res adjudicata in favor of Mid-Continent because of the fact that they were, or could have been, decided in Mid-Continent v. Smith, supra.

The District Court found the facts specially and therefrom concluded that neither Mercoid nor its dealer installed the heating system referred to in the Smith case, supra, and that the decree in that case was not res adjudicata against Mercoid as to contributory infringement of the Cross patent, nor to the defense of laches, nor to the defense that Mid-Continent had attempted through its method of doing business to expand its patent to monopolize the sale of combustion stoker switches.

It further concluded that Mid-Continent through its predecessor had knowledge of

Mercoid's low limit control prior to the issuance of the patent, and that Mid-Continent was thereby guilty of laches in not instituting this action prior to September 10, 1940, citing Wheatley v. Rex-Hide, D.C., 25 Fed.Supp. 543; Id., 7 Cir., 102 F.2d 940.

The District Court further concluded that Mercoid M-61 stoker control was a modification of a patented Mercoid (Figure 50) furnace control which was on the market in 1925; that Mercoid M-61 was not built for the express purpose of providing purchasers with means to perform the Cross patented heating system and did not contribute to the infringement of the Cross patent in suit, nor did two other Mercoid devices, referred to as TJV and JMV.

It further concluded that Mid-Continent's method of doing business fell within the condemnation of Carbice Corporation v. American Corporation, 283 U.S. 27, 51 S. Ct. 334, 75 L.Ed. 819, and Leitch Mfg. Co. v. Barber Company, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, as the practical equivalent of granting a written license with the condition that the patented system might be practiced only with combustion stoker switches purchased from its licensees; that the patent was being utilized to gain a monopoly beyond its legitimate scope, and its sole purpose as used by Mid-Continent was to suppress competition in the manufacture and sale of combustion stoker switches; that Mid-Continent's method of doing business led to the suppression of competition in unpatented appliances and was sufficient to deny the relief sought in its complaint; that Mid-Continent was not in a position to maintain this suit, under the ruling of American Lecithin Co. v. Warfield, 7 Cir., 105 F.2d 207; that Mid-Continent had conspired with Honeywell which had developed its combustion stoker switch independently of the Cross patent, and marketed it before the grant of that patent, and then conspired with Mid-Continent in restraint of trade in interstate commerce to establish a monopoly in interstate commerce in an unpatented appliance beyond the scope of the patent in suit, in violation of the Anti-Trust laws; and that that conspiracy constituted a restraint of trade, and an attempt to monopolize, under 15 U.S.C. A. §§ 1 and 2, by reason of which Mercoid was entitled to injunctive relief under section 4 of that title. See 43 F.Supp. 692.

On these conclusions the court decreed that the bill of complaint be dismissed, and enjoined each plaintiff from bringing suit for contributory infringement of the patent against Mercoid's customers, and from directly or indirectly threatening its customers with suit for such infringement of the patent, or in any manner interfering with Mercoid's business by use of the patent in suit.

It further decreed that the Honeywell license including power thereunder to Honeywell to also sub-license others to make, use and sell and to sub-license the invention of the system patent on the payment of a royalty on each sale of an unpatented appliance, and by conveying with each sale of such unpatented appliance in interstate commerce by Honeywell, a license to practice the invention of the patent in suit constituted a conspiracy and combination in restraint of trade in violation of 15 U.S. C.A. §§ 1 and 2. The decree further ordered a perpetual injunction against both plaintiffs, their officers and agents, both individually and collectively, from doing the following things:

(1) From further engaging in or carrying out said conspiracy or any other conspiracy having a similar purpose or effect;

(2) From doing any act or thing having the same purpose or effect as the acts done in pursuance of such controversy, or promoting, or tending to promote the purpose or effect thereof involving the patent in suit;

(3) From enforcing or carrying out, directly or indirectly, any of the provisions of the Honeywell license or its sub-licenses, or any similar licenses of the same tenor or effect, which involve the patent in suit.

Such injunction was ordered not to become effective until 45 days after the date of the decree. The decree dismissed the defendant's counterclaim with respect to damages, and the costs were assessed against both plaintiffs. All parties have appealed from this decree.

The validity of this patent is conceded. In Smith v. Mid-Continent Investment Company, supra, M-61 was involved, and the defenses were that there was no infringement, and that if the claims relied upon read upon the accused device, the patent was invalid as being an aggregation and a mere paper patent. Those issues were there decided adversely to Smith. He did not rely upon invalidity because of anticipation or prior publication, although he might have done so, and Mercoid might have done so, because it conducted and paid

for the defense. Whether that decree is res adjudicata as to the question of infringement by the use of Mercoid's M-61 is of little moment at present, for we approve that opinion both in its logic and conclusions with respect to infringement. That opinion very clearly sets forth the patent and its elements, and fully describes their functions, as well as those of M-61. They will not be repeated here, except to say that the separate thermostatic control (as described in Claim 1) actuated by predetermined minimum temperatures in the combustion space is the same as the M-61 control.

In that case Mercoid contended that plaintiffs' commercial structure placed this control in the breeching of the furnace, which is the by-pipe connected at one end to the furnace and at the other end to a portion of the flue extending from the furnace to the chimney, and that while a similarly functioning thermostat is in the accused structure, the patent locates the thermostat inside the fire pot of the furnace. The court in that case fully discussed this contention and held that the change of position by Mercoid of that particular thermostatic control was not sufficient to avoid infringement. With the reasons and conclusions of that court in this respect we fully agree, and for the same reasons we hold that M-61 when used in the Cross combination patent is an infringement of that patent.

The District Court thought that if Mercoid owned or controlled a valid patent on the element M-61, which it claims it does, it would have the right to make that element and to sell it to any one for any purpose. We think that would extend Mercoid's rights beyond the limits of the statute. We have no doubt that Mercoid under such circumstances would be permitted to make as many of those controls as it might desire without being guilty of infringement or contributory infringement, and if such control could be used for purposes other than that of Cross' combination, Mercoid could sell the element and fully instruct the purchasers as to such other uses, because plaintiffs do not hold a patent on the control itself. However, plaintiffs own and control the combination patent before us, of which the control in question is an element, and Mercoid will not be permitted to infringe that combination either directly or by contribution. If plaintiffs, without license, make use of Mer-

coid's patented control in its combination they would be liable to respond to Mercoid in profits or damages for such use, and it would seem that the rights of all parties under their respective patents would be fully protected.

Whether the use of Mercoid's TJV and M-11 controls in domestic heating systems amount to infringement of the Cross patent depends upon whether they operate at predetermined minimum temperatures. These controls are best illustrated by a comparison with M-61. The M-61 is directly connected with the automatic stoker and it operates at a predetermined low temperature to start the stoker when the temperature of the stack, or other place in the furnace where such control may be located, reaches that predetermined low degree. In other words, it causes the stoker to start feeding the furnace at an estimated time when the fire is soon likely to go out.

TJV and M-11 are two separate devices. They cooperate to produce the same result as does M-61. M-11, in operating position is placed wherever M-61 may be placed for operation, and in general outside appearance they are quite alike. M-11 is so constructed that it functions whenever the temperature at its location begins to drop. It is not directly connected with the stoker but it is directly connected electrically with TJV, and is designed to be located at any convenient place without the furnace. This latter device is also directly connected electrically with the stoker. It is so constructed as to close the circuit to the stoker at a predetermined period of time, after M-11 has functioned, usually from ten to sixty minutes, as the operator may desire. It contains, among other things, a clock-like structure which measures the predetermined time, and at the expiration of that time TJV operates to close the switch to the stoker. Hence, when the room thermostat stops the stoker, and the temperature at M-11 begins to drop, the latter begins to operate, which starts the clock in TJV, which in turn starts the stoker at the end of the predetermined time.

In other words, M-61 operates to close the circuit directly to the stoker motor, after a predetermined low temperature in the stack has been reached, and operates to open that circuit after the fuel has been replenished and the stack temperature reaches a predetermined high. It also has a dial which can be set to enable the switch to open or close at a certain specified temp-

erature. The M-11 switch, which instead of operating directly to close immediately the circuit to the stoker motor, operates a timing device which delays operation of the stoker for a predetermined period. After the fuel has been replenished and the stack temperature begins to rise, the M-11 operates to open the circuit to the timing device and immediately stops further operation of the stoker. It has no dial for opening or closing the switch at certain specified temperatures. However, plaintiffs assert that the combination of M-11 and TJV still operates at a temperature which can be predetermined. Mercoid denies this assertion.

The undisputed evidence discloses that under ordinary conditions the average furnace, after being heated to a known high temperature, will cool at a known rate of speed and that such cooling under ordinary conditions of the furnace, when plotted on graph paper, using time against temperature, is generally known as the "cooling curve." Such a "cooling curve" was in evidence in the Smith case, supra, and can be made easily for any furnace. In a curve of that type, where the temperature is plotted against time, after the temperature of the furnace rises to a known high, it can be determined what the temperature in that furnace will be at the end of a given period of time. Hence, plaintiffs contend that since the TJV can be set to function at different intervals of time, then it can be determined, knowing from what high temperature the furnace is cooling, at what temperature the stoker will operate after any given period of time. True, the predetermined temperature involved in the "cooling curve" process is an approximation, and may be affected by different conditions in different furnaces, yet the undisputed evidence discloses that that approximation is very close to the predetermined temperature relied upon in M-61, and in the Cross patent, and all produce practically the same result.

The experts were substantially agreed on this but they differed as to the interpretation of the words in the claim "predetermined minimum temperatures." Mercoid's expert interpreted these words narrowly and thought that the word "predetermined" meant a rigidly fixed and specific degree of temperature at which the relay must operate at all times. Plaintiffs' expert based his opinion on a more liberal interpretation of that word. He said: " * * * it is my understanding that the patent is to be interpreted as broadly as possible in view of limiting prior art. Judge Reeves' decision (in the Smith case) was to the effect that the patent is entitled to extremely broad interpretation. Therefore, in the absence of limiting prior art, and there is no prior art in this particular situation that requires the patent to be limited to any particular operating temperature, it is my opinion the language over which Mr. Schultz and I are in disagreement is entitled to a broad interpretation, and so interpreted covers not only the infringing arrangement shown in Exhibit 37 (Mercoid's wiring diagram, in its former infringing installation, not here in issue) but also the TJV and JMV devices."

A reading of the Smith case convinces us that the interpretation of plaintiffs' expert is correct, and we think that the use of M-11 and TJV in the Cross combination is an infringement of that patent. In other words, we think that TJV and M-11, in conjunction, are actuated by predetermined minimum temperatures, in the combustion space, although expressed in terms of the known time in which those low temperatures will approximately be reached in the natural course of events.

The accused device JMV is merely a combination of TJV and M-11 in one device, and in its installation it is placed in the same position as M-11 or M-61. It works in the same manner and produces the same result as do the accused devices TJV and M-11. For the same reason, when used in Cross' combination, we think it clearly infringes the patent.

It is not here contended that Mercoid infringes the patent directly, for it does not sell or install furnaces. However, it does manufacture and sell the accused devices, or it has done so, and for the purpose of promoting those sales it has advertised extensively the use of such devices in the Cross combination to accomplish the same purpose in the same manner, or its equivalent, as does Cross with his control. Included in those advertisements are detailed specifications and drawings to aid the purchaser in making the installation. While the Cross patent, as such, is not referred to in those advertisements, yet it is asserted by plaintiffs, without contradiction, that there is no use for the accused devices other than in the patented Cross combination. We are unable to conceive of any other such use.

Under these circumstances we think it cannot be denied that a purchaser of any

of Mercoid's accused devices, who used it in his furnace for the purpose intended by Mercoid, other than for repair and replacement made necessary by deterioration so as to preserve its fitness, would be guilty of infringement. Leeds & Catlin Co. v. Victor Talking Machine Company, 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816. Likewise, under the same circumstances, and under the ruling of the same case, we think Mercoid must be held guilty of contributory infringement. See also this court's ruling, Fehr v. Activated Sludge, Inc., 7 Cir., 84 F.2d 948; Lincoln Engineering Company v. Stewart-Warner Corporation, 7 Cir., 91 F.2d 757. The latter case was reversed on the question of validity only, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008.

There was much evidence offered by Mercoid and admitted, over plaintiffs' objections, disclosing prior use by Mercoid of its other controls, and patented controls of others, some of these uses being for more than a year prior to the date of the Cross application, and some later. None of the cited patents bore date of application or issuance as early as those of Cross, except the patent of McCabe, No. 1,734,016, which was earlier than Cross as to both. However, we assume that none of these prior uses nor the prior invention of McCabe discloses the invention of Cross, because of the presumption of validity of the Cross patent arising from its issuance, supported by the concession of the parties hereto that validity is not here in issue. Furthermore, the Cross patent is in combination, while McCabe, and the other uses admitted in evidence, refer only to one element of that combination, and Mercoid will not be permitted to infringe that combination by any contributive use of any of his controls in that combination, whether they be patented or not.

The only reason suggested by Mercoid for offering such evidence was to show that long before Mercoid existed it was customary in hot air heating systems to employ a room thermostat to control the operation of a motor to operate dampers, and with safety devices to close the dampers in case the temperature in the furnace became excessive. Neither McCabe nor any of the prior uses thus relied upon, except the accused devices of Mercoid, disclosed a thermostatic control actuated by predetermined minimum temperatures in the combustion space for preventing extinguishment of the fire when operating under low heat requirement conditions. Of course,

McCabe's disclosures and the prior uses might be suggestive of the Cross disclosure to such an extent that one might consider the Cross disclosures as nothing more than mechanical skill, but again, that would involve validity with which we are not here concerned, unless the protection of public interest demands it. We are convinced that such protection is not warranted here.

■ We realize that this court is bound by the findings of fact of the District Court, if they are supported by substantial evidence, but we are not bound by such findings unless they are so supported, nor are we bound by fact conclusions drawn therefrom. In this respect we refer more particularly to Findings 6, 11, and 12, and findings of fact contained in conclusion 4, with which we disagree. Finding 6 states that the accused controls do not operate at a predetermined low temperature. This we have heretofore discussed. Finding 11 states that there was no evidence that the Cross Coal-O-Matic Company (Mid-Continent's assignor) ever practiced the Cross invention prior to the assignment in 1930. Mr. Cross, Jr., gave affirmative testimony to the contrary, and it was not denied. Finding 12 refers to the royalty clause in the license agreements, and states that royalty payments were to be based upon what were known to the parties as combustion stoker switches, which the finding defines as "a combustion stoker control unit including an automatic electric switch responsive directly to temperatures of combustion gases or boiler water produced by an automatic coal fed stoker."

The license, however, defined this unit as a "combustion stoker control unit' including an automatic electric switch responsive" as stated in the finding, but it further added as a part of such definition, *when such stoker and switch is "adapted, in combination with other devices and apparatus, for the control of automatically operated coal fuel stokers, to prevent the extinguishment of its fire when operating under low heat requirement conditions."* The District Court's ruling was to the effect that royalty payments under plaintiffs' license were to be based on any switch which was responsive directly to temperatures of combustion gases or boiler water produced by an automatic coal fed stoker, regardless of how the switch was to be used, when in fact the license states that royalty payments are to be based on such unit only when it is to be used with other

devices and apparatus as a fire mainte-nance control. Conclusion of law 4 states that M-61 was not built for the express purpose of providing purchasers with means to perform the Cross heating system. It is not denied that it is one element there-of. The record discloses no other use, and Mercoid suggests none. We think this find-ing has no factual support.

Plaintiffs further contend that the District Court erred in ruling that they are barred from maintaining this action be-cause of laches in bringing it. Under the rulings of Stearns-Roger Mfg. Co. v. Brown, 8 Cir., 114 F. 939; Searchlight Horn Co. v. Victor Talking Machine Co., D.C., 261 F. 395; and Smith Hardware Co. v. Pomeroy Co., 2 Cir., 299 F. 544, we think this contention must be sustained. The District Court based its ruling in this re-spect upon Wheatley v. Rex-Hide, Inc., 25 F.Supp. 543, affirmed, 7 Cir., 102 F.2d 940, and analogous cases. A reading of those cases, however, discloses facts which read-ily distinguish them from the facts before us, and from those set forth in the cases upon which we rely.

Appellants further contend that the Dis-trict Court erred in holding that Mid-Con-tinent's method of doing business with re-spect to the patent is the practical equiva-lent of granting a written license with the condition that the patented system may be practiced only with combustion stoker switches purchased from Mid-Continent's licensee, and in further holding that such conduct amounted to an unlawful combina-tion in restraint of trade on the part of appellants, and an attempt on their part to suppress competition and to establish a monopoly in interstate commerce in an un-patented appliance beyond the scope of the Cross patent, in violation of 15 U.S.C.A. §§ 1, 2, and 4.

We think the District Court's holdings in this respect are erroneous. Congress, by authority of our Constitution, has pledged the public faith to each patent owner to exclude others from practicing his invention for a limited time, and the anti-trust laws do not forbid contracts between the owners of patents and their licensees which are legitimate and within the scope of the patent. Bement v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058. A patent owner, in the legitimate exercise of his rights, may restrain con-tributory infringement of his patent by the sale of the "advance of the art," if such sale is made with the knowledge and inten-tion that the subject matter thus sold is to be used for the purpose of contributing to infringement of the patent. Leeds & Catlin v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816; Wallace v. Holmes, 29 Fed.Cas. page 74, No. 17,-100, 9 Blatchf. 65.

It seems to us that there is nothing ob-jectionable in Mid-Continent's method of doing business with respect to this patent. It was a valid patent, as is conceded here, and the owner had a right to manufacture and sell the patented combination and to license others to do so. At first it attempt-ed to manufacture and sell it, but after a short time it abandoned that course and granted and offered licenses to companies that would take them, including Mercoid, who refused. Moreover, Mid-Continent sent letters to non-licensed manufacturers who were contributing to the infringement of the patent. Finally, Mid-Continent granted an exclusive license to Honeywell, and by that act it lost all control over the further licensing of the patent but retained the right to bring suit against infringers, and upon that right this suit is instituted. There is nothing wrong in any of these ac-tions providing the license did not exceed the limits of the patent, and herein lies the point in controversy.

Mercoid does not deny that Mid-Conti-nent had the right to constitute Honeywell its exclusive licensee, but its contention is based on the method by which the royalties due from Honeywell to Mid-Continent are calculated, as set forth in section 2 of the license. The only complaint which Mercoid urges here is that the royalty payments are based on the stoker switch without regard to how or where this switch is to be used. We think, however, that this is a misinter-pretation of the plain language of the li-cense. The switch referred to is specifical-ly defined in the claims as an automatic electric switch, which is responsive to stack temperatures or boiler water, and *which is used in combination with other devices and apparatus to prevent extinguishment of the fire when operating under low heat require-ment conditions.* From this italicized lan-guage, which Mercoid does not emphasize in its argument, it is clear to us that Hon-eywell does not intend to pay, and Mid-Continent does not intend to receive royal-ties on any switch which is not used for fire maintenance purposes under the Cross patent.

It was upon such interpretation that Mid-Continent and Honeywell adopted the method of basing the royalties upon the control when thus used. This record discloses that Mid-Continent has never received royalty on anything other than complete installations coming within the scope of the Cross claims. If these accused controls can be used for any purpose other than in the Cross combination, Mercoid or anyone else is at liberty to sell and use them for that purpose. If such control cannot be used for any other purpose, that fact would not give Mercoid any right to infringe the Cross combination either directly or by contribution. We see nothing here that would violate the anti-trust laws or that would constitute unfair competition. Certainly it cannot be said that notices given or circulars distributed to the trade, setting forth the licensee's rights under a patent, and warning against infringement, would constitute unfair competition. Alliance Securities Co. v. DeVilbiss Mfg. Co., 6 Cir., 41 F.2d 668; Cheney Co. v. Cunningham et al., D.C., 37 F.Supp. 224. The only issue between Mercoid and Honeywell is whether the latter by itself, or in combination with others, attempted to use the Cross patent and monopolize an article beyond the bounds of the patent, and thereby violated the anti-trust laws. From what we have said we are convinced that Honeywell, under this evidence, is not guilty of that charge.

In support of Mercoid's contention to the contrary, it relies upon Carbice Corporation v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Company, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Morton Salt Company v. Suppiger Co., 314 U.S. 488, 62 S. Ct. 402, 86 L.Ed. 363; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, and other kindred cases. The facts in those cases are readily distinguishable from those here. They are consistent with the ruling in the case of Leeds & Catlin v. Victor, supra, and are so held by the Supreme Court in the Carbice and Leitch cases, supra.

Mid-Continent further contends that the case of Mid-Continent Inv. Co. v. Smith, supra, is res adjudicata as to all questions which were there decided or which might have been put in issue and decided in that case. Honeywell does not and cannot present that issue here because it was not a party to that action, nor was it in any way connected with that case. As between Mid-Continent and Mercoid, we think the contention must be sustained, except as to the question of laches. See Doherty Research Co. v. Universal Oil Products Co., 7 Cir., 107 F.2d 548; Warford Corp. v. Bryan Screw Co., 6 Cir., 44 F.2d 713; Galion Iron Works v. Adams Mfg. Co., 7 Cir., 128 F.2d 411; General Motors Corp. v. Swan Carburetor Co., 6 Cir., 88 F.2d 876. On the contrary, Mercoid relied upon Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc., 2 Cir., 116 F.2d 845, and analogous cases. It is clear from the reading of those cases that they are not here in point.

From what we have said it is clear that the District Court was not in error in disallowing damages under the cross complaint. In that respect the District Court's ruling is affirmed, and in all other respects it is reversed and this case is ordered remanded to the District Court for further proceedings not inconsistent with this opinion.